FILED
APR - 6, 1999
JUDGE JOHN F. GRADY
UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No. 97 CR 759 |
| | ) | Judge John F. Grady |
| STEVEN D. BERG | ) | |

DOCKETED
APR 12 1999

PLEA AGREEMENT

This Plea Agreement between the United States Attorney for the Northern District of Illinois, SCOTT R. LASSAR, and the defendant, STEVEN D. BERG, and his attorney, STEVE MUSLIN, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed, in part by Rule 11(e)(1)(C), as more fully set forth in paragraph 15 below.

This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 97 CR 759.

This Plea Agreement concerns criminal liability only, and nothing herein shall limit or in any way waive or release any administrative or judicial civil claim, demand or cause of action, whatsoever, of the United States or its agencies. Moreover, this Agreement is limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities except as expressly set forth in this Agreement.

By this Plea Agreement, SCOTT R. LASSAR, United States Attorney for the Northern District of Illinois, and the defendant, STEVEN D. BERG, and his attorney, STEVE MUSLIN, have agreed upon the following:

EXHIBIT
1

26

1. Defendant acknowledges that he has been charged in the information in this case with devising a scheme to defraud purchasers of autographed sports memorabilia, in violation of Title 18, United States Code, Section 1343, and willfully failing to file an income tax return for the year 1996, in violation of Title 26, United States Code, Section 7203.

2. Defendant has read the charges against him contained in the information, and the charges have been fully explained to him by his attorney.

3. Defendant fully understands the nature and elements of the crimes with which he has been charged.

4. Defendant will enter a voluntary plea of guilty to Counts One and Two of the information in this case.

5. Defendant will plead guilty because he is in fact guilty of the charges contained in Counts One and Two of the information. Defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt. The statement of the following facts is not an exhaustive account of the defendant's knowledge of the events described. Rather, the following statement of facts contains a true and accurate statement of facts necessary to establish a factual predicate to the defendant's plea of guilty.

As charged in Count One of the information, the defendant acknowledges that beginning in or about early 1994, and continuing until in or about November 1997, at Chicago, and elsewhere defendant, along with others co-schemers, devised, intended to devise, and participated in a scheme and artifice to defraud

purchasers of autographed sports memorabilia, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, by creating and distributing throughout the United States large quantities of forged sports memorabilia.

In particular, the defendant acknowledges there existed throughout the United States a market for the purchase and sale of autographed sports memorabilia. Autographed sports memorabilia primarily consisted of either sports clothing, such as jerseys or shoes; sports equipment, such as bats and balls; or pictorial items, such as trading cards, photographs, and posters, all of which would bear the signature of a professional athlete connected in some way with the item of sports memorabilia.

The price of an item of autographed sports memorabilia depended on a variety of factors, including the success and popularity of the athletes whose signatures appeared on the item. The defendant sold large quantities of sports memorabilia bearing forged autographs of professional athletes, knowing the autographs were not genuine. In addition, the defendant also marketed and sold jerseys and shoes that were purportedly worn by professional athletes, knowing that these items had never been worn or used by the corresponding professional athlete.

From early 1994 through late 1997 the defendant distributed and held in his inventory for future sales numerous items of forged sports memorabilia, primarily related to professional basketball players, with an aggregate value of more than $500,000,

representing that these items were genuine to various distributors and consumers. The defendant purchased large quantities of unsigned sporting goods items, including jerseys, basketballs, shoes, photographs, and other items, for the purpose of placing forged autographs of one or more athletes on the sporting good items. Specifically, the defendant provided many of these unsigned items of sports memorabilia to Jon S. Schwartz and Kevin Walsh, who charged a fee for placing forged autographs on the items. The forging fee depended in part on the value of the item signed.

The defendant obtained "pro-cut" athletic jerseys of various professional basketball players, including NBA All-Star Jerseys for various 1996 All-Stars, for the purpose of altering the jerseys to make the jerseys appear as though they had been worn in games by the professional basketball players, or simply representing that the jerseys had been worn during a game by the professional athletes. The defendant caused various alterations to be made to the jerseys so that he could represent that they had been game worn. Specifically with regard to jerseys for Michael Jordan and Scottie Pippen of the Chicago Bulls, the defendant caused alterations to the jerseys, including adding various emblems, so that the modified jerseys appeared to be have been worn by Michael Jordan and Scottie Pippen during the 1997 NBA Championship Finals.

The defendant sought to market the altered jerseys that he represented had allegedly been worn by Michael Jordan during the 1997 NBA Championship Finals for $25,000 per jersey.

The defendant sold and distributed some of the forged sports memorabilia to other Chicago retail distributors, to specialized auctioneers in Chicago, Milwaukee, and Florida, knowing that these other distributors would market and sell the items as genuine. Many of the distributors to whom the defendant sold forged sports memorabilia were aware that the autographs were forged. To create the appearance of legitimacy, the defendant caused items that he knew to be forged sports memorabilia to be given to two different individuals who held themselves out as able to perform handwriting comparisons for the purpose of "authenticating" the signatures of various athletes. The defendant was able without difficulty to obtain from these persons written "authentications" attesting to the supposed genuineness of numerous forged autographs. Both of these experts were reputed by trade publications to be among the most capable sports memorabilia authenticators.

The defendant did not request or require certificates of authenticity regarding forged sports memorabilia from Kevin Walsh or Jon Schwartz. When requested by a purchaser, however, the defendant regularly provided false certificates attesting to the authenticity of the forged signatures. These certificates of authenticity were usually purported to be issued by a third party.

The defendant further acknowledges that on or about October 6, 1997, he falsely and fraudulently represented to a business associate that he could obtain Michael Jordan's autograph on Michael Jordan's 1996 NBA All-Star jersey for $500. The defendant also falsely represented that he could obtain Michael Jordan's

autograph on a black baseball hat bearing the insignia Chicago Bulls 1997 NBA Champions.

On October 10, 1997, the defendant took possession of a black baseball hat that bore the insignia, "Chicago Bulls 1997 NBA Champions" (the "Finals Hat") for the alleged purpose of having Michael Jordan autograph the hat. On October 22, 1997, the defendant falsely represented that he had obtained Michael Jordan's signature on the Finals Hat and that he could deliver the Finals Hat to the customer shortly. On October 29, 1997, the defendant provided the Finals Hat which bore a forged signature of Michael Jordan on the brim of the hat to a business associate for a sports memorabilia customer from Japan.

On November 3, 1997, the defendant took possession of a Michael Jordan, 1996 NBA All-Star jersey on which the defendant previously indicated he could obtain Jordan's signature so that the autographed jersey could be sold to a customer in Japan. On November 6, 1997, the defendant produced the Michael Jordan, 1996 NBA All-Star jersey with a forged autograph of Michael Jordan. The defendant falsely and fraudulently represented that he had obtained Michael Jordan's autograph on the jersey while at the Chicago Bulls vs. Orlando Magic basketball game on November 5, 1997. The defendant stated that Michael Jordan autographed the jersey in the tunnel that accesses the visiting team's locker room at the United Center.

The defendant acknowledges that on or about July 18, 1997, at Chicago, the defendant, for the purpose of executing his scheme,

and attempting to do so, knowingly did cause to be transmitted by means of wire and radio communication in interstate commerce from Florock Company in Japan to Chicago, Illinois, writings, signs, signals and sounds, namely the facsimile of an order to have Michael Jordan's signature applied to a black baseball hat that bore the insignia, "Chicago Bulls 1997 NBA Champions" (the "Finals Hat").

As charged in Count Two of the information, the defendant acknowledges that during the calendar year 1996, in the Northern District of Illinois, he resided in Chicago, Illinois, and received gross income from the sale and creation of fraudulent sports memorabilia of at least $100,000 for that year. By reason of such income he was required by law, following the close of the calendar year 1996, and on or before April 15, 1997, to make an income tax return to the District Director of Internal Revenue for the Internal Revenue District of Chicago, at Chicago in the Northern District of Illinois, Eastern Division, or to the Director, Internal Revenue Service Center, Midwest Region, Kansas City, Missouri, stating specifically the items of his gross income and any deductions and credits to which he was entitled. Well knowing all of the foregoing facts, the defendant acknowledges that he willfully did fail to make the required income return to the District Director, to the Director of the Internal Revenue Service Center, or to any other proper officer of the United States, at the time required by law.

The defendant further acknowledges that his gross income was approximately $116,000 from the sales of forged sports memorabilia to John Divelbiss Sports Memorabilia, Inc. and a certain charitable organization during 1996.

6. For purposes of applying the guidelines promulgated by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994, the parties agree on the following points:

(a) With respect to Count One, the applicable guidelines calculations are as follows:

(1) Pursuant to Guideline 2F1.1(a), the defendant's base offense level is level six (6).

(2) Pursuant to Guideline 2F1.1(b)(1)(K), because the amount of loss from the offense of conviction was more than $500,000 but less than $800,000, the defendant's offense level is increased ten levels to level sixteen (16).

(3) Pursuant to Guideline 2F1.1(b)(2), because the offense involved more than minimal planning, the defendant's offense level is increased two levels to level eighteen (18).

(b) With respect to Count Two, pursuant to Guideline 3D1.2(c), Count Two is grouped with Count One for purposes of the determining the applicable guideline range.

(c) Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if the defendant continues to

accept responsibility for his actions, within the meaning of Guideline 3E1.1, a two-level reduction in the offense level will be appropriate.

(d) Defendant has provided timely complete information concerning his own involvement in the offense, and has notified the government timely of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently, within the meaning of Guidelines § 3E1.1(b); an additional one-point reduction in the offense level is therefore appropriate, provided the court determines the offense level to be 16 or greater prior to the operation of Guidelines § 3E1.1(a); and

(e) Based on the facts known to the government, the defendant's criminal history category is I.

(f) The defendant and his attorney and the government acknowledge that the above calculations are preliminary in nature and based on facts known to the government as of the time of this Agreement. The defendant understands that the Probation Department will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Sentencing Guidelines calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations.

7. Errors in calculations or interpretation of any of the guidelines may be corrected by either party prior to sentencing.

The parties may correct these errors or misinterpretations either by stipulation or by a statement to the probation office and/or court setting forth the disagreement as to the correct guidelines and their application. The validity of this Agreement will not be affected by such corrections, and the defendant shall not have a right to withdraw his plea on the basis of such corrections.

8. Defendant understands the counts to which he will plead guilty carry the following penalties:

(a) Count One carries a maximum penalty of 5 years' imprisonment and under Title 18, United States Code, Section 3571, a maximum fine of the greater of $250,000, or twice the gross loss to the victims of the offense, as well as any restitution ordered by the Court.

(b) Count Two carries a maximum penalty of 1 year imprisonment and a maximum fine of $100,000, together with costs of prosecution estimated not to exceed $500.

(c) Defendant understands that Count One carries a term of supervised release of at least two years, but not more than three years and that Count Two carries a term of supervised release of no more than one year.

Therefore, the total potential sentence carried under the counts to which defendant will plead guilty is 6 years' imprisonment and a $350,000 fine, a term of supervised release as well as any restitution ordered by the Court.

9. The defendant understands that in accord with federal law, Title 18, United States Code, Section 3013, upon entry of

judgment of conviction, the defendant will be assessed $100 on Count One and $25 on Count Two to which he has pled guilty, in addition to any other penalty imposed. The defendant understands that the government will request the Court to order the defendant to pay the special assessment of $125 at the time of sentencing with a check or money order made payable to the Clerk of the U. S. District Court.

10. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

(a) If defendant persisted in a plea of not guilty to the charges against him, he would have the right to a public and speedy trial. The trial could be either a jury trial or a trial by the judge sitting without a jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

(b) If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent, and that it could not convict him unless, after hearing all the

evidence, it was persuaded of defendant's guilt beyond a reasonable doubt and that it was to consider each count of the information separately.

(c) If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

(d) At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them. In turn, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court.

(e) At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

(f) Defendant understands that he has a right to have the charge prosecuted by an indictment returned by a concurrence of twelve or more members of a legally constituted grand jury consisting of not less than sixteen and not more than twenty-three members. By signing this Agreement, defendant knowingly waives his right to be prosecuted by indictment and to assert at trial or on appeal any defects or errors arising from the information, the

information process, or the fact that he has been prosecuted by way of information.

11. Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraph. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. The defendant is also aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the sentence imposed. Acknowledging all of this, the defendant knowingly waives the right to appeal any sentence within the maximum provided in the statute of conviction (or the manner in which that sentence was determined) on the grounds set forth in Section 3742 or on any ground whatever, in exchange for the concessions made by the United States in this Plea Agreement. The defendant also waives his right to challenge his sentence or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under Title 28, United States Code, Section 2255, except for a claim based upon ineffective assistance of counsel.

12. Defendant understands that the information and this Plea Agreement are matters of public record and may be disclosed to any party.

13. Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation Office of the nature, scope and extent of defendant's

conduct regarding the charges against him, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

14. Defendant agrees he will fully and truthfully cooperate with the government in any matter in which he is called upon to cooperate that is related to the subject matter or results from the charges in this case. Defendant agrees to provide complete and truthful information in any investigation and pre-trial preparation, and complete and truthful testimony, if called upon to testify, before any federal grand jury and United States District Court proceeding, and any related civil administrative or Court proceeding.

15. At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation, and, assuming the defendant's full and truthful cooperation, shall move the Court, pursuant to Sentencing Guideline 5K1.1, to depart from the applicable sentencing guidelines range, and to impose the specific sentence agreed to by the parties as outlined below. Defendant understands that the decision to depart from the applicable guidelines range rests solely with the Court. However, this Plea Agreement is governed, in part, by Federal Rule of Criminal Procedure 11(e)(1)(C). That is, the parties have agreed that the sentence imposed by the Court shall equal one year and one day of imprisonment. Other than the agreed term of incarceration, the parties have agreed that the Court remains free to impose the sentence it deems appropriate. If the Court accepts

and imposes the agreed term of incarceration set forth, the defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(e)(2) and (4). If, however, the Court refuses to impose the agreed term of incarceration set forth herein, thereby rejecting the Plea Agreement, or otherwise refuses to accept the defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound thereto.

16. Regarding restitution, the parties agree that the offense to which defendant is pleading guilty is an offense against property which was committed by fraud and deceit, and thus an order of restitution is required pursuant to 18 U.S.C. § 3663A. Defendant acknowledges that the conduct which forms the basis for the charges to which he is pleading guilty caused losses to various parties in excess of $100,000, under 18 U.S.C. secs. 3663A and 3664(f)(1)(A). Defendant will cooperate fully with the United States Attorney's Office and the United States Probation Office in their determination of the actual losses and the appropriate amount of restitution to be ordered by the Court. Such cooperation shall include truthful disclosure by the defendant of his financial status, including all tax returns and related information as may be requested. Defendant understands that providing false or incomplete information may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the court.

17. Nothing in this Agreement shall limit the Internal Revenue Service in its collection of any taxes, interest or

penalties from the defendant. The defendant understands that the amount of tax as calculated by the Internal Revenue Service (IRS) may exceed the amount of tax due as calculated for the criminal case.

(a) Defendant agrees to transmit his original records or copies thereof, and any additional books and records which may be helpful, to the Examination Division of the IRS so that the IRS can complete its civil audit of the defendant for the tax years 1992 through 1996.

(b) Preliminary to or in connection with any judicial proceeding, as that term is used in F.R.Cr.P. 6(e), defendant will interpose no objection to the entry of an order under Rule 6(e) authorizing disclosure of those documents, testimony and related investigative materials which may constitute grand jury material. Defendant will not object to the government soliciting consent from third parties, who provided information to the grand jury pursuant to a grand jury subpoena, to turn those materials over to the Civil Division, appropriate federal or state administrative agency or the IRS, for use in civil or administrative proceedings or investigations, rather than returning them to such third party for later summons or subpoena in connection with the civil case or collection of taxes from defendant.

18. Defendant understands that his compliance with each part of this Plea Agreement extends throughout and beyond the period of his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Agreement. He further understands

that in the event he violates this Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute the defendant not subject to any of the limits set forth in this Agreement, or to resentence the defendant. The defendant understands and agrees that in the event that this Plea Agreement is breached by the defendant, and the Government elects to void the Plea Agreement and prosecute the defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

19. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, to cause defendant to plead guilty, other than those set forth in this Plea Agreement.

20. Should the judge refuse to accept the defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound thereto.

21. Defendant agrees this Plea Agreement shall be filed and become a part of the record in this case.

22. Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant

further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: 4/6/99

SCOTT R. LASSAR
United States Attorney

STEVEN D. BERG
Defendant

JEROME N. KRULEWITCH
Assistant United States Attorney

STEVE MUSLIN
Attorney for Defendant