IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 97 CR 759 |
| | ) | |
| v. | ) | Chicago, Illinois |
| | ) | April 6, 1999 |
| STEVEN BERG, | ) | 11:50 a.m. |
| | ) | |
| Defendant. | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOHN F. GRADY

APPEARANCES:

For the Plaintiffs: HON. JAMES B. BURNS,
United States Attorney
219 South Dearborn Street
Chicago, IL 60604, by
MR. JEROME N. KRULEWITCH,
Assistant United States Attorney

For the Defendants: STEVEN B. MUSLIN, LTD.
19 South LaSalle Street
Suite 700
Chicago, IL 60603, by
MR. STEVEN B. MUSLIN

COURT REPORTER: LAURA M. BRENNAN
219 South Dearborn Street, Room 2280
Chicago, IL 60604
(312) 427-4393

EXHIBIT
2

(The following proceedings were had in open court:)

THE CLERK: 97 CR 759, USA v. Steven Berg, for change of plea.

MR. KRULEWITCH: Good morning, your Honor; Jerry Krulewitch on behalf of the United States.

MR. MUSLIN: Steven Muslin on behalf of Steven Berg.

THE COURT: Good morning.

Do we have anything else for this morning other than this?

MR. KRULEWITCH: No.

THE COURT: Okay.

MR. KRULEWITCH: Judge, as well, I have an agreed order regarding disposition of property that in my view is part of the plea although not incorporated specifically, and we will begin with that. I just wanted you to have that as well.

THE COURT: All right.

(Brief interruption.)

THE COURT: All right, Mr. Berg, I have been reading the plea agreement, and let me summarize what you are charged with in this case. There are two counts.

By the way, we have not had a waiver of indictment yet, have we?

MR. KRULEWITCH: I believe we did, Judge.

THE COURT: Before a magistrate judge or what?

MR. MUSLIN: I don't recall.

MR. KRULEWITCH: I believe it was before your Honor. I believe Mr. Muslin wasn't there.

MR. MUSLIN: My associate, Mr. Rainville, was here the first time up.

MR. KRULEWITCH: I think in an abundance of caution -- it is in the plea agreement -- if you can an address that issue.

THE COURT: I don't want to go through the --

MR. KRULEWITCH: No, I don't think you need to go through the whole --

My recollection is there was a waiver of indictment.

THE COURT: All right, we will cover it again.

Let me first then deal with that, Mr. Berg. One of the two charges made in this case is a felony; that is, the crime of wire fraud is a felony, and a felony is any crime that is punishable by imprisonment of more than one year.

We have not done this before because I would have remembered the facts of this case.

A defendant who is about to be charged with a felony is entitled to have the case presented to a grand jury so that the grand jury can look at the evidence and decide whether there is probable cause to believe that the defendant committed the offense.

A grand jury is a group of 23 citizens who are summoned and convened for the purpose of examining evidence

that the government presents that it believes is sufficient to warrant criminal prosecution, but the prosecution cannot take place unless the grand jury agrees and finds that there is probable cause to believe that the defendant committed the offense. If the grand jury believes that there is probable cause, they vote what is known as an indictment, and that is then drafted by the prosecutor, and it sets forth the details of the crime, and then it is signed by the grand jury foreman and by the prosecutor, and the case then proceeds pursuant to that indictment.

Now, another way of doing it, which is the way adopted here, is to dispense with the grand jury, not have the grand jury of 23 citizens that serves as a screening group but, rather, simply to permit the prosecutor to go ahead and file the charge on his own without the intervention of the grand jury. That is what is proposed here.

That is done frequently, but the point is that the defendant must understand that he is entitled to have a grand jury look the thing over before it goes ahead. And if you agree not to do it, you are giving up something that could be important to you. My job at this point is to make sure you understand that.

Do you understand that?

THE DEFENDANT: Yes, I do, your Honor.

THE COURT: You have discussed that with your

attorney?

THE DEFENDANT: Yes.

THE COURT: You are willing to have this matter go ahead as a criminal information, which is what the prosecutor files, rather than filing an indictment?

THE DEFENDANT: Yes, your Honor.

THE COURT: All right. Do we have a written waiver? Okay.

You can go ahead and sign that written waiver.

MR. MUSLIN: Your Honor, I am tendering to the clerk a signed and prepared waiver of indictment.

THE COURT: All right. I will add my own signature then as a witness, and the waiver may be filed.

Now, let me just very briefly describe what the information charges, Mr. Berg, and then I am going to ask you to tell me in a little more detail in your own words just what happened here.

There are two counts to the information; that is, the charge, two counts to the charge. Count 1 charges that you engaged in a scheme to defraud sports fans essentially and that the scheme consisted of your selling athletic equipment such as jerseys, balls, and that sort of thing that purported to be signed by famous athletes, such as Michael Jordan or people of that athletic prominence. And then you would obtain money from people who were interested in paying for the signatures of

these athletes on these sporting materials.

The indictment alleges, or the information, rather, alleges that all these signatures were forged, that, in fact, these weren't the signatures of Michael Jordan or these other people, and these jerseys are not in fact worn by Michael Jordan during the 1997 playoff games and so on. In other words, all of this material that you were selling was bogus.

Then it is alleged that pursuant to that scheme to defraud, you caused the wires to be used. In one instance here that is charged, there was an order taken from Hawaii that went by wire.

MR. KRULEWITCH: Japan, actually, your Honor.

THE COURT: Japan, okay.

It is a criminal offense to use a wire such as a telegram or a wire transfer or a telephone call or anything of that kind in furtherance of a scheme to defraud, and that is the statute under which this particular count of the information is brought.

The other count of the information charges that you failed, knowingly failed, to file an income tax return for the year 1996 when you had a level of income that required you to file a return. And that count is brought under a statute which makes it a criminal offense to knowingly fail to file a federal income tax return.

All right, do you understand what you are charged with

in these two counts?

THE DEFENDANT: Yes, I do, your Honor.

THE COURT: Now, tell me in your own words just what you did here. Let's start with the athletic equipment. What was involved there?

THE DEFENDANT: What I did is I obtained various equipment by purchasing it through Sport Mart, Sports Authority, Champion Products, and so on, and attempted to get various athletes to sign it. When that could not be expedited, the players went out of town or whatever, I unknowingly got involved with people at the time that turned out to be forgers. At the time I didn't know they were forgers. Later on I realized that I should have --

THE COURT: Now, you are not being charged with negligence here. That is something that is very important.

What you are being charged with here is intentionally defrauding these people by knowingly misrepresenting that these were authentic signatures on these sporting items. If you were misled by somebody else and victimized yourself, you are not guilty of any crime.

So the question is: What is it here? Did you know that these were forged signatures and, nonetheless, attempt to market this merchandise or not?

THE DEFENDANT: Your Honor, on some of them, yes, I did. I was aware of that; certain autographs were forged.

THE COURT: One thing that is mentioned here in the information is that you represented to somebody that you could get a jersey that had been worn by Michael Jordan in one of the playoff games --

THE DEFENDANT: Yes.

THE COURT: -- autographed for $500. I mean, Michael Jordan wouldn't say hello to you for $500, would he?

THE DEFENDANT: That is probably true.

THE COURT: Certainly that wasn't a genuine transaction, was it?

THE DEFENDANT: Part of the asking -- or request for the money was a true transaction. The legitimacy of the autograph was not.

THE COURT: Right. I don't want you to plead guilty, Mr. Berg, unless you are telling me that you had a scheme to defraud here. If you were mistaken or misled or overly optimistic or any way you might want to characterize it that would be consistent with your innocence, then we don't have a plea of guilty.

Did you knowingly and intentionally tell people, prospective customers, that these sports items, sports apparel and sports equipment such as jerseys and basketballs, bore the genuine signatures of famous athletes such as Michael Jordan when, in fact, you knew that the signatures were forged?

THE DEFENDANT: Yes, I did.

THE COURT: And, in fact, did you pay people to forge these signatures on these items?

THE DEFENDANT: Yes, sir.

THE COURT: There were a couple of people, one of them whose name was Walsh, that you actually paid to do this very thing --

THE DEFENDANT: Yes, your Honor.

THE COURT: -- of forging the signatures, right?

THE DEFENDANT: Yes.

THE COURT: Okay. Now, that is what you are here for today, if that is indeed your purpose. Tell me what happened.

I am not shocked. I do this for a living. But, I mean, the point is I don't want you to tell me you did this if you didn't do it, but if you did do it and you want to plead guilty, then let it all hang out. I mean, don't go halfway.

THE DEFENDANT: I did it.

THE COURT: Okay. Now, on the income tax return for 1996, did you know you were supposed to file one?

THE DEFENDANT: Yes, I did.

THE COURT: You didn't do it?

THE DEFENDANT: I filed for extensions, and that was it.

THE COURT: Then what happened?

THE DEFENDANT: They wouldn't give extensions past October 15th. That was --

THE COURT: And then what did you do past October 15th?

THE DEFENDANT: Past it?

THE COURT: Right.

THE DEFENDANT: Nothing.

THE COURT: You did not file anything?

THE DEFENDANT: No, I did not, your Honor.

THE COURT: What is the law on that? I mean, if you asked for an extension --

MR. KRULEWITCH: He knew --

THE COURT: What if you actually need more time and they won't give it to you? Are you guilty of a crime if you don't file?

MR. KRULEWITCH: Judge, I am not sure that that is exactly the way it played out, but if you are told to file a tax return, and he was given an extension, and you don't have a valid basis and you fail to do so, then it is a misdemeanor charge within the statute.

You need to know you are obligated to do it. You need to have reportable income that would require you to file a return. If those conditions are true and then you have a date by which you don't file a return, that is a misdemeanor that is in violation of 7203.

He needs to file a return now at that point. So, yes, I mean, if you ask for an extension now, the IRS will grant an

extension if there is a valid basis. So that is a separate issue.

THE COURT: Well, the question is, in Mr. Berg's case, I guess: Did you have the ability to file a return by the extended time?

THE DEFENDANT: Yes, I did, your Honor.

THE COURT: Okay, and you didn't do it?

THE DEFENDANT: No, I did not.

THE COURT: All right. The Court is satisfied then that the --

By the way, the particular charge here on the fraud is that you caused to be transmitted by means of wire communication from Florock Company in Japan to Chicago an order to have Michael Jordan's signature applied to a black baseball hat that bore the insignia "Chicago Bulls 1997 NBA Champions."

Do you recall that particular situation?

THE DEFENDANT: Yes.

THE COURT: That was an order for what you knew was going to be a forged signature?

THE DEFENDANT: Yes, your Honor.

THE COURT: Well, you seem to hesitate.

THE DEFENDANT: Yes.

No -- yes, that is what it becomes.

THE COURT: All right, the Court is satisfied that the defendant understands the charges and that he acknowledges his

guilt of each of the charges.

MR. KRULEWITCH: Judge, for the record, in doing that, I assume you are also relying, obviously, on the written factual basis that he has accepted and adopted by signing the plea agreement?

THE COURT: And the plea agreement itself, yes, indeed, which has been signed by you, Mr. Berg, is that correct?

THE DEFENDANT: Yes, your Honor.

THE COURT: Now, let me go over the possible penalty here with you, and counsel can correct me if I have this wrong, but as I understand it, on Count 1, the fraud count, the possible statutory penalty would be five years and $250,000, and on the failure to file count, Count 2, that would be one year and $500.

MR. KRULEWITCH: $100,000, your Honor.

THE COURT: $100,000.

MR. KRULEWITCH: Together with costs of prosecution, not to exceed 500.

THE COURT: Okay. That is the statutory penalty.

However, the actual penalty is governed by what we call the sentencing guidelines, and here what we are talking about is sentencing guidelines that appear to come out to a level 15 and a criminal history category of one, which yields a range of what?

MR. KRULEWITCH: I believe it is 18 to 24, if I am not mistaken, your Honor; 18 to 24, your Honor.

THE COURT: Eighteen to 24 months would be the sentencing range on the guidelines.

However, there is still a third level of inquiry, and; that is, that the government has indicated, and you have indicated in the plea agreement here, that in return for your full cooperation, the government will recommend to the Court that it depart from the sentencing range established by the guidelines and impose a sentence of no more than one year and one day.

Is that correct?

MR. KRULEWITCH: That is the -- that is the exact sentence we have agreed to, your Honor.

MR. MUSLIN: That's correct, your Honor.

MR. KRULEWITCH: Not less, not more than that.

THE COURT: So if everything goes well for you in the sense that the government is satisfied with your cooperation and it makes the necessary recommendation, the Court could impose a sentence of as little as one year and one day.

On the other hand, if the Court were to impose the maximum possible sentence under the guidelines, which I could do either if the government doesn't make the departure recommendation or if I choose not to follow the departure recommendation, you would be facing a period of 24 months

maximum.

So the difference between the low and the high is one year and a day versus 24 months. Do you understand that?

THE DEFENDANT: Yes, I do, your Honor.

MR. KRULEWITCH: Judge, so it is clear for the record, the plea agreement is an 11(a)(1)(c). So if you did reject the agreement, I believe Mr. Berg would have the right to withdraw his plea.

THE COURT: All right, fine.

Then the possible fine here is --

What is it on the guidelines?

MR. KRULEWITCH: Under the guidelines, Judge?

THE COURT: Pretty high, whatever.

MR. KRULEWITCH: Judge, the range for the fine would be $4,000 to $40,000.

THE COURT: Oh, okay, 4 to 40,000.

Then the supervised release?

MR. KRULEWITCH: Would be two to three years on Count 1 and no more than one year on Count 2.

THE COURT: Concurrent?

MR. KRULEWITCH: That would certainly be -- you could do whatever you chose in that regard, your Honor.

THE COURT: Those are the possible elements of the sentence.

Do you understand all those, Mr. Berg?

THE DEFENDANT: Yes.

THE COURT: In addition to the incarceration, there would be this possibility of a fine up to $40,000.

Then whatever period of incarceration you do receive, you would have an additional period on what we call supervised release, and that could be from two to three years, and you are on supervision.

You were sitting here when I dealt with a defendant in a previous case who was on supervised release, and he was having some problems with that. But what that involves is reporting to a probation officer and complying with the rules. If you don't, if you violate the supervised release, it is possible you could go back to prison for an additional period of time. So those are all the elements of the possible penalty.

MR. KRULEWITCH: Your Honor, one last thing would be restitution, obviously, which also would be mandatory to the extent the probation office determines that is appropriate, as well as a special assessment of $125.

THE COURT: Right. The possible restitution here is what?

MR. KRULEWITCH: Well, Judge, it is an unknown figure, and we are working on it in terms of the -- we are going through the records to determine what he would have to reimburse and we will work that out with Mr. Muslin and the

probation department.

THE COURT: Do you have any idea what the maximum might be?

MR. KRULEWITCH: I believe what we had said in paragraph 16 was approximately -- that it would be slightly in excess of $100,000.

THE COURT: All right. You will have to make restitution to anybody who was defrauded in this scheme, and that will be part of the sentence, and that could be somewhere up in the neighborhood of $100,000. But whatever it is, that will be an additional --

MR. MUSLIN: I have explained to Mr. Berg because I do see a quizzical look on his face. After speaking --

His restitution is based on his ability to make restitution.

THE COURT: Yes.

MR. MUSLIN: He can't make restitution from moneys that he does not have available.

THE COURT: I mean, if you don't have the money, you can't do it. On the other hand, you will be expected to make reasonable efforts to make restitution.

Okay. Do you have any questions about any of this?

THE DEFENDANT: No, your Honor.

THE COURT: The final thing I want to --

Well, a couple of things. Has anybody made any

threats against you to cause you to plead guilty here?

THE DEFENDANT: No.

THE COURT: Put any pressure on you to cause you to plead guilty?

THE DEFENDANT: No.

THE COURT: You are doing this of your own free will, are you?

THE DEFENDANT: Yes.

THE COURT: Do you have any medical condition or any kind of --

THE DEFENDANT: Bronchial asthma.

THE COURT: -- problem that interferes with your ability to think clearly?

THE DEFENDANT: No.

THE COURT: Then the final thing I want to address is what you will be giving up here, Mr. Berg, if you plead guilty.

What you will be giving up is your right to have a trial on these charges. You would have a right to have a jury trial on these charges. You would plead not guilty or persist in your present plea of not guilty, and we would convene a jury here. We could also have a bench trial, but I will talk about this in terms of a possible jury trial.

We would summon a number of people from the voters' rolls to come here to the courtroom and to be examined concerning their fairness and their willingness and ability to

try the case fairly. And you and your attorney would have a right to participate in the selection process. These people would be asked questions concerning their backgrounds and their attitudes, and anyone on the jury panel you thought would not make a fair juror could be excused, and we would end up with 12 jurors who would be acceptable to both sides. And once we had those jurors selected, they would be sworn to try the case.

We would then proceed with the trial, and the government would call its witnesses, offer whatever documents or other evidence it has to prove its case; and during that portion of the case, your attorney would have the right to cross-examine the government witnesses, test their testimony by asking them questions, to challenge their credibility.

When that part of the case had been concluded, then you would have a right to put on any defense that you have. You could call witnesses, offer documents, whatever other kinds of evidence you might want to offer. You could testify or not as you saw fit, and if you elected not to testify, I would specifically tell the jury that they could not hold that against you. They would not be able to say, well, he didn't testify, therefore, he must be guilty. That is the very thing that the jury is not permitted to do. And believe it or not, they don't do it. I have seen many instances where that is quite clear.

Now, at the conclusion of all the evidence, the jury

is instructed by me on what the law is, and one of the things I tell them is that they must find you not guilty unless they find beyond a reasonable doubt that you are guilty on each of these charges. If even one of the 12 jurors had a reasonable doubt of your guilt on either of the charges, you would have to be found not guilty on that charge or those charges because the verdict of the jury has to be unanimous. All 12 of them have to agree either guilty or not guilty. If they don't agree, we have to scrub the whole thing, start over again with a new jury, new trial.

If the jury should find you guilty, you would have a right to appeal to a higher Court, and if that Court found that your trial had not been fair or some other kind of error had caused you prejudice, it could reverse your conviction and send the case back here for a new trial, again, before a different jury.

Now, those are the rights that you have as you stand here today. If you plead guilty today, those rights disappear because you have given them up. You will have no trial. There will be no jury, there will be no witnesses. There will be essentially no hearing. There will be a proceeding to determine what the appropriate sentence will be, but it is not the same thing as a trial. Your guilt will be determined by your plea of guilty, and we won't have a trial for the purpose of deciding that question.

The question of the sentence will still be open, and we have discussed what the various possibilities are there. But if you plead guilty, you could still appeal any error I might make in this sentence, but, as a practical matter, you won't be able to appeal the finding of guilt. In other words, if you plead guilty today, that pretty well ends it as far as your guilt is concerned.

Do you understand all that?

THE DEFENDANT: Yes, I do, your Honor.

MR. KRULEWITCH: Judge, so it is clear, there is also an appellate waiver here by Mr. Berg of everything but ineffective assistance of counsel.

THE COURT: All right. In your plea agreement, you have agreed to give up your right to appeal anything but an ineffective assistance of counsel argument on appeal.

Then there was something here you mentioned, Mr. Krulewitch, about an order regarding disposition of property.

MR. KRULEWITCH: That is correct, Judge.

The FBI is currently in possession of numerous items of forged or altered sports memorabilia consistent with the items set forth in the information. As a result of the defendant's plea of guilty and his continued cooperation, the FBI no longer needs to retain as evidence each and every item of the forged memorabilia but, instead, is going to photograph

and preserve it for evidence in that manner.

The forged memorabilia has a de minimis value because all of the signatures appearing on the items are forged. The FBI has the ability to mark the forged items with ink so it is obvious that they are forged.

What we would ask, Judge, and what Mr. Berg has agreed is to forfeit the sports memorabilia to the United States to be disposed according to law. Mr. Berg and the FBI would like for those items to be donated to one or more charities that will distribute the items to needy children in the Chicago area.

THE COURT: Not, however, bearing the forged signatures.

MR. KRULEWITCH: The forged signatures will be inked out. And the FBI, what they have done in the past, is put a stamp on it to indicate that it is forged or some indication that it is not legitimate, and we will then distribute that to charities for them to pass out to children. And Mr. Berg has further agreed that he won't take an income tax deduction based upon that as part of the plea.

THE COURT: All right, fine.

MR. KRULEWITCH: That is the order that we have before your Honor that we would ask you to sign.

Now, I know there are a couple of exceptions, and we have worked that out.

MR. MUSLIN: Judge, we have a list --

We are not asking for any of the forged items back. There are items which are authentic and there are some personal items that were taken that have nothing to do with sports at all. We would just ask that we be allowed to go through those with Mr. Walker and Mr. Krulewitch, obtain those.

THE COURT: The order will only --

MR. KRULEWITCH: Cover the forged or the altered material, your Honor.

THE COURT: -- forged or altered material, all right.

Mr. Berg, do you now plead guilty to Counts 1 and 2 of this criminal information?

THE DEFENDANT: Yes, I do, your Honor.

THE COURT: The Court will accept the plea and enter a finding of guilt on each count, and the cause is referred to the probation office for a presentence investigation.

Disposition?

THE CLERK: July 1st at 10:00 o'clock.

MR. MUSLIN: Is there any way we could go to either the middle of June or like the second week in July because I am trying to go away over the 4th of July weekend.

THE CLERK: July 8th at 10:00 o'clock.

MR. MUSLIN: July 8th.

THE CLERK: Thursday.

MR. MUSLIN: Thursday, July 8th.

MR. KRULEWITCH: Could we do it the next week perhaps

so there is not an issue?

THE CLERK: July 15th.

MR. MUSLIN: I hate to be a pain, but how about Wednesday, the 14th? Is that possible? The only reason is I am sure my daughter's camp's visiting day is the weekend of the --

THE CLERK: Wednesday the 14th at 11:30.

MR. MUSLIN: Thank you.

MR. KRULEWITCH: 11:30.

MR. MUSLIN: Thank you very much.

MR. KRULEWITCH: Thank you, your Honor.

The agreed order was entered by your Honor, so the FBI can proceed?

THE COURT: Yes, right.

MR. KRULEWITCH: Thank you very much.

THE COURT: I have signed it.

(Which were all the proceedings had in the above entitled cause on the day and date aforesaid.)

(I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.)

Laura M. Brennan — 8-7-01

Laura M. Brennan
Official Court Reporter
Northern District of Illinois

Date